UNITED STATES *v.* COHN CO. (No. 1554).[1]

CELLULOID, WHEN NOT PARTLY POLISHED.

Celluloid sheets, tubes, and rods, which have not been subjected to any process designed to polish them, but which may have been polished to some extent as an incident to their undergoing a process for smoothing and straightening them, are dutiable at 25 per cent ad valorem as "not polished, wholly or partly," under the second clause of paragraph 25, tariff act of 1913.

United States Court of Customs Appeals, December 6, 1915.

APPEAL from Board of United States General Appraisers, G. A. 7701 (T. D. 35245).

[Affirmed.]

*Bert Hanson,* Assistant Attorney General (*Charles D. Lawrence* of counsel), for the United States.
*James L. Gerry,* as *amicus curiæ.*
*Allan R. Brown,* for appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:
Paragraph 25 of the tariff act of 1913 is as follows:

25. Collodion and all other liquid solutions of pyroxylin, or of other cellulose esters, or of cellulose, 15 per centum ad valorem; compounds of pyroxylin or of other cellulose esters, whether known as celluloid or by any other name, if in blocks, sheets, rods, tubes, or other forms not polished, wholly or partly, and not made into finished or partly finished articles, 25 per centum ad valorem; if polished, wholly or partly, or if finished or partly finished articles, of which collodion or any compound of pyroxylin or other cellulose esters, by whatever name known, is the component material of chief value, 40 per centum ad valorem.

---

[1] Reported in T. D. 35979 (29 Treas. Dec., 710).

Thereunder merchandise concededly known as celluloid and represented before us by Exhibits 1, 2, 3, 4, 5, and 6 was assessed for duty at 40 per cent ad valorem. Exhibit 1 is a celluloid tube, Exhibit 2 is a celluloid rod, while Exhibits 3, 4, 5, and 6 are small rectangular pieces of celluloid in sheets.

The appraiser appears to have reported that the merchandise was celluloid in sheets, rods, and tubes, wholly or partly polished, and it was so classified and assessed.

The importers protested, claiming duty under the same paragraph at 25 per centum upon the ground that the merchandise was not wholly or partly polished within the meaning of the statute.

Upon hearing, the Board of General Appraisers by majority opinion sustained the protest, and the Government appeals to this court. A considerable amount of testimony was introduced before the board.

As to the method of manufacturing the merchandise involved in this case, it is in substance agreed, as it was in effect found by the board, that pyroxylin or celluloid is first made into blocks commonly about 36 inches long and 20 inches in width. These blocks are then fed through a machine known as a "sheeter," which, by successive operations, reduces the blocks to the form of sheets having the same dimension as the blocks with the exception of thickness, which varies according to the product desired. The importations of the sheet celluloid in this case are from about one-sixteenth to one-eighth of an inch in thickness, but they are produced much thicker or much thinner as the requirements may be. These sheets are then placed in a drying room for the purpose of seasoning, during which process the volatile solvents evaporate leaving the sheets in a warped, unstraightened form showing thereon the knife marks produced by the cutting operations of the sheeter machine. Thereafter the sheets, usually in groups of 12 or more, are straightened by heating and subjecting them to pressure in an hydraulic press which, generally speaking, leaves them regular and even in form. This heat and pressure partially removes the knife marks and renders the surface somewhat smoother. In this condition they are the subject of commerce, but usually they are not such before being so straightened. If any considerable degree of polish is required, the sheets are further treated by heating and subjecting the same to pressure between metallic plates, the greater pressure producing the smoother finish and higher polish. The heat renders the sheets sufficiently plastic so that they receive and retain the finish of any object placed next to them. Sufficient pressure will remove all traces of the knife marks resulting from the sheeting process. These marks have been partially removed from the imported sheets here, but are plainly visible, and the sheets have not been subjected to pressure between metallic

plates, but have been subjected to pressure in a press where the surface of one sheet was in contact with the surface of another. In other words, they have been subjected to the process of heating and pressure necessary to straighten the same after they have remained a proper length of time in the drying room.

Illustrative exhibits are before us showing the condition of the sheets in their varying degrees of polish or finish. There are three such exhibits—illustrative Exhibit A representing the surface of sheets like official Exhibits 3, 4, 5, and 6, showing the full size thereof and knife marks thereon; illustrative Exhibit B shows a sheet polished by hydraulic pressure between metal plates upon which there are no knife marks; while illustrative Exhibit C represents a much thinner sheet than the official Exhibits 3, 4, 5, and 6, and is in the condition when removed from the drying room and before being straightened or smoothed.

The Government's evidence establishes that sheets of the thickness and finish of illustrative Exhibit C, and like sheets from 0.005 to 0.010 of an inch in thickness, are, before being smoothed and straightened and in the condition as taken from the drying room, an article of commerce, but, as stated, all the witnesses agree that sheets of the thickness of the official exhibits are not such to any or any considerable extent until after they have been subjected to the straightening process.

The tube represented by Exhibit 1 has an exterior diameter of a little more than three-fourths of an inch with an interior diameter of about one-eighth of an inch less, and the rod represented by Exhibit 2 is a little less than one-eighth of an inch in diameter. The rods are made by forcing the plastic celluloid through a small cylinder containing an orifice the size of the rod to be produced, while the tubes are produced by forcing the same material through a similar cylinder having a round aperture with a center core. Like the sheets the rods and tubes are then placed in the drying room, from which, after they have remained a proper length of time, they are taken and by the use of a mandrel or other suitable tool they are straightened. The evidence leaves the methods employed in straightening these rods and tubes somewhat uncertain. The witnesses substantially agreed that polish was given to these tubes or rods by the application of a polishing wheel or plate, by the use of an abrasive material, or by placing them in an acid bath, and as we understand the evidence all the witnesses agreed that the rods and tubes in this case have not been so polished. In other words, they are in the condition as left by the straightening processes.

From what we have said it will be observed, therefore, that none of the merchandise here involved has been subjected to any process primarily designed to produce a polished surface, but the Govern-

ment, while conceding the point, insists that nevertheless the application of heat and pressure to the merchandise when it emerges from the drying room has resulted in partly polished surface or surfaces and, therefore, that the same are partly polished within the contemplation of the paragraph. A similar contention is made on behalf of an *amicus curiœ*, whose brief and argument have been received and considered in the case.

It may be of some benefit, without going into the details of processes by which celluloid is obtained, to quote the description of celluloid given in Spons' Encyclopædia:

Celluloid consists virtually of vegetable fiber, treated with a mixture of nitric and sulphuric acids, and which, for want of a better term, may be called "pyroxylin," though it is not identical with that compound; this is dissolved in a suitable solvent and afterwards dried. The product is a light yellowish-brown colored body, which can be carved, planed, turned, sawn, stamped, or polished, and made either opaque or transparent. It may be made as hard as ivory, which it closely resembles, but is always elastic, and may be molded into any form.

Of like import is a description of this commodity given in Bersch "Cellulose, Cellulose Products, and Artificial Rubber," at page 280.

Both the majority and minority opinions of the board are well reasoned and the case itself is not without difficulty. It was sharply contested before the board and has been ably presented in this court. Its determination rests, of course, upon the ascertainment of what Congress meant by the use of the terms, "if in blocks, sheets, rods, tubes, or other forms not polished, wholly or partly" and "if polished, wholly or partly," it being manifest that the one expression is designed to be the opposite of the other. It is not contended by the Government that the merchandise is "articles" within the contemplation of the statute.

It appears that the word "polish" in connection with celluloid products was first employed in tariff statutes in the act of 1897, where (see par. 17) celluloid "rolled or in sheets, polished, and not made up into articles" was given a lower rate of duty than if the same was "in finished or partly finished articles." In paragraph 17 of the act of 1909, it was provided that celluloid "in blocks, sheets, rods, tubes, or other forms, not polished, wholly or partly, and not made up into finished or partly finished articles" also took a lower rate of duty than "if polished, wholly or partly, or if in finished or partly finished articles." It will be noted in the paragraph of the act of 1913, under consideration, a similar classification is provided for.

The evidence in the case before us clearly demonstrates, as was found in the minority opinion below, that these imported sheets become a merchantable commodity after having been submitted to

the straightening or smoothing process, and it also, with equal conclusiveness, shows that after they have been submitted to what are purely subsequent polishing processes they are more largely commercial commodities. We think the evidence also clearly shows that the rods, tubes, and sheets involved in this case are material for the production of a large variety of celluloid articles, and that when so used they receive, in the process of their manufacture into such articles, a greater polish than is found upon the merchandise before us; that is, if celluloid in the precise condition of the imported merchandise is used as material for celluloid articles, the celluloid in the finished article will show a higher degree of polish than it now presents. For instance, Mr. Lefferts, one of the witnesses in behalf of the Government, testified as follows:

Q. You know the articles made out of merchandise like the Exhibit A and the Exhibits 3 to 6?—A. I know a good many; I can not say I know all.

Q. Largely used for making hairpins and barrettes?—A. I think most largely used.

Q. Is it not true that such articles made from the illustrative Exhibit A and Exhibits 3 to 6 are subjected to a polishing process by the manufacturer before being marketed?—A. I should think so in every case.

Witness Gudger, another Government witness, likewise testified:

Q. Now, when articles like the Exhibits A and 3 to 6 in this case are bought by people they make things out of it?—A. Yes, sir.

Q. They are the raw product of manufacturers of other articles, is it not true—makers of combs, barrettes, hairpins—are the largest users of merchandise like the Exhibit A?—A. Of that color.

Q. Is it not true that those people after making their finished product, after they make the product they sell—the barrette or hairpin—they have to polish those articles before placing them on sale?—A. Yes, sir.

It should be noted here that these two witnesses were all who testified on behalf of the Government, one being connected with one and the other with another of two of the three principal concerns in this country which manufacture celluloid.

Witnesses for the importers gave like evidence and extended the same to the tubes and rods. We infer, however, from the testimony that a larger proportion of rods and tubes is the subject of commerce before being polished than of the imported sheets. The chief controversy both before the board and in this court was with reference to the sheets, and as to the rods and tubes the record is in some respects unsatisfactory.

The Government witnesses, while testifying that the process to which the imported sheets had been subjected had resulted in partly polishing their surfaces, were nevertheless careful in describing the sheets to speak of them as having been smoothed or straightened, and witness Gudger, although testifying that " unpolished " was not a trade term, nevertheless admitted that the domestic producer with

which he was connected received orders for unpolished sheets and that he would catalogue Exhibits 3, 4, 5, and 6 under the letter " S," which means smoothed or straightened. He further said that the letter " H " catalogued sheets polished on one side, " HH " those polished on both sides, and " SS " those smoothed or straightened on both sides. A similar business classification of the merchandise was testified to by the other Government witness, and no one claimed that in the trade the imported merchandise was bought or sold as a polished commodity.

It is unnecessary to go into an elaborate discussion of the meaning of the word " polish." Ordinarily it means, as applied to mechanical operations, a surface made smooth and glossy by friction or abrasion or by the application of some polishing substance, like varnish, while, as appears by the record in this case, celluloid may also be polished by heat and pressure, or by an acid bath. Smoothness is, we think, hardly synonymous with polish. Smooth is the antonym of rough, and each word is relative in its meaning and application, depending upon the object it is used to describe. So also is the word " polished." Some articles by reason of their texture may not be able to receive the same degree of polish as others or to feel equally smooth to the touch or so appear upon a microscopic examination. Celluloid, it may be observed, appears to be susceptible of receiving an extremely high degree of both smoothness and polish, and indeed of the official exhibits before us it may be admitted that they are in a state of smoothness that some substances could attain, if at all, only after undergoing numerous finishing processes. The merchandise involved in this case, however, has not been subjected to any *per se* polishing process. It has not, so far as disclosed by the record, been wholly or partly polished as a result of any process that has been applied thereto which was designed to produce such a condition, and so far, if at all, as a polished surface is found upon any of the official exhibits, it is an incident to a process applied for the purpose of smoothing and straightening the same and is not the primary purpose of such process.

At the risk of some repetition it may be observed here that in this case we have for comparison three sheets as exhibits which show the surface of celluloid sheets in three stages only of manufacture. One, illustrative Exhibit C, is much thinner than any of the imported sheets and is in the condition it assumed after having been cut from the celluloid block and seasoned in the drying room; another, illustrative Exhibit B, is much thicker than Exhibit C, is thinner than some and about the thickness of one of the imported sheets, and is polished on both sides; while the other, illustrative Exhibit A, shows the condition of the imported sheets resulting from the heat and pressure applied in the straightening process and is about one-eighth

of an inch in thickness. Instituting a comparison among these three sheets it is at once apparent that to the sense of touch it is difficult to say that Exhibit A is far, if at all, removed from the quality of smoothness and polish shown by Exhibit C, but it is straight and uniform in shape like Exhibit B. Upon Exhibit B neither touch nor microscopic examination with a glass of small power discloses any roughness of the surface; on the contrary, it appears to be perfectly smooth, and the knife marks seem to be entirely obliterated. Upon Exhibit A these knife marks are plainly discernible to the unaided sight and readily discoverable by the sense of touch, and it is doubtful to us if the sheet itself shows a polished surface when the nature and fineness of texture of the substance of celluloid is taken into consideration. Exhibit C is warped, its edges are not straight, and it is concededly not polished in whole or in part. It is difficult for us to say that the knife marks upon this exhibit are much if any more pronounced than those upon Exhibit A, and we are wholly unconvinced that Exhibit A presents a higher degree of polish than Exhibit C. In other words, the imported sheets have no greater degree of polish than Exhibit C, which confessedly is unpolished and has been subjected to no operation except that of drying since it was cut from the celluloid block.

We think in the enactment of the paragraph Congress took cognizance of the fact that unpolished celluloid was less expensive than polished, intended to impose a higher rate of duty upon the more expensive commodity, and used the words polished or partly polished as referring to blocks, sheets, rods, or tubes which had been subjected to a process the primary purpose of which was to polish the same or, at least, to a process that did in fact result in a commodity that in the nomenclature of the manufacturer would be either polished or partly polished celluloid. The celluloid products now under consideration are within neither of these classes.

It is urged by the Government that unless the merchandise at bar is held to be partly polished there is no room for the operation of that provision. We can hardly say upon the record before us that this will necessarily be so. We are not sure that a sheet polished upon one side and not upon the other might not be partly polished, neither is it at all clear that celluloid products, which have been subjected to one of the several processes that may be applied thereto for the *purpose* of producing a polish, would not also be partly polished within the meaning of the paragraph. Indeed, we are not certain upon the record what celluloid sheets of the thickness of the official exhibits here would be entitled to the lower rate of duty, unless it be such as these importations.

While we are not disposed to rest the decision upon that ground, yet the administrative practice under preceding tariff acts is entitled

to some consideration here. It appears from the testimony that during a part of the time when the act of 1897, before referred to, was in force, and during all the life of the act of 1909, merchandise like that now before us was, at the port of New York, passed as rods, tubes, or sheets of celluloid unpolished, *i. e.*, not polished wholly or partly. This administrative treatment seems to have obtained until by the instructions of the Treasury Department, dated April 18, 1914 (T. D. 34394), the collector of customs at New York was directed to classify celluloid sheets, which had been subjected to hydraulic pressure between steel plates, as sheets wholly or partly polished, and was further directed to assess a like duty upon celluloid sheets with smooth but dull surfaces if the same had been advanced beyond the condition of unpolished sheets by subjecting them to hydraulic pressure. By further instructions, under date of August 9, 1914, the department, while reiterating its directions contained in the Treasury decision above mentioned, indicated that the same should not be construed as holding that celluloid sheets might not be polished or partly polished by processes other than the one described in the Treasury decision, and as to whether such plates (sheets) were unpolished, partly polished, or polished must be determined by the examiner of each particular importation; and it was by virtue of these instructions that the assessment was made in this case. The importers claim here that under these instructions the collector was not justified in his assessment. It is not important to determine if this claim is well founded, as, whether or not the departmental instructions have been correctly construed, we are satisfied upon the facts before us that it was error to assess the merchandise here as polished or partly polished.

The judgment of the Board of General Appraisers is *affirmed.*